**OSWALD et al. v. UNITED STATES.**

No. 7395.

Circuit Court of Appeals, Ninth Circuit.

June 4, 1934.

Murphy & Doherty, George D. Blair, J. Gilbert Fall, and M. L. Rabbitt, all of Los Angeles, Cal., for appellants.

Peirson M. Hall, U. S. Atty., and Robert Winfield Daniels and John Powell, Asst. U. S. Attys., all of Los Angeles, Cal., for the United States.

Before WILBUR and GARRECHT, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

The following statement of facts from the appellants' opening brief is accepted by the appellee as correct, and in the main conforms to the evidence:

"On September 9, 1933, one Marion Newman was, on an ex parte motion, appointed receiver for a corporation known as Southern California Kennel Club, Inc. The order appointing the receiver authorized him to take possession of all the property of said corporation. On the night of September 9, 1933, the receiver Newman, with a United States Marshal and an attorney, went to the dog racing track called the Southern California Kennel Club where dogs were being raced. The Marshal went for the purpose of serving a copy of the order appointing the receiver on an officer of said corporation. After arriving at the dog track, one of the employees at the track let Newman, his attorney and the Marshal in a room where approximately $8,500.00 in cash was lying on tables. The Marshal served George H. Oswald, president of the corporation, Southern California Kennel Club, Inc., with a copy of the order appointing Newman receiver. The defendants were informed Newman was receiver of said corporation, at which time Newman, as receiver of said corporation, requested possession of the $8,500.00, and also the dog track and the equipment. George H. Oswald told Newman, the receiver, that there were no assets belonging to the corporation. George H. Oswald led the attorney for the receiver from the money or cash room on to the grounds. Thereafter Newman, the receiver, left the money room at the request of George H. Oswald. However, he was requested by George H. Oswald to wait on the premises for a few

minutes until George Blair, his attorney, arrived. In about 30 minutes, George Blair, the attorney, arrived and was introduced by George H. Oswald to the receiver and his attorney and was given a copy of the order appointing Newman receiver, and after reading it over, George Blair informed Newman there was nothing to turn over, as the Southern California Kennel Club, Inc., had no assets except a couple of books which were in the possession of said Blair, which he would be glad to deliver to the receiver.

"Thereafter criminal contempt proceedings were filed against the defendants and they were subsequently convicted and are the appellants herein."

The information alleging contempt after stating the effect of the order appointing Marion Newman receiver of the Southern California Kennel Club, Inc., and directing him to take possession of all the property of that corporation, alleged as follows:

"That on said September 9, 1933, the said Marion Newman, being then and there the duly appointed, qualified and acting receiver of said Southern California Kennel Club, Inc., accompanied by Vincent Mangerina, who was then and there a Deputy United States Marshal for the Southern District of California, proceeded to the place of business of the said Southern California Kennel Club, Inc., which is located in the City of Compton, County of Los Angeles, State of California, to take possession of the said assets of said Southern California Kennel Club, Inc., pursuant to and in accordance with the said order of said court; that the said receiver and the said Deputy United States Marshal then and there entered the cash room of said Southern California Kennel Club, Inc., which was then and there situated in the grand stand upon the premises of the said Southern California Kennel Club, Inc., and demanded from the cashier there in charge, to wit: Frank C. Bellman, the cash on hand of the said Southern California Kennel Club, Inc.; that at said time, the said George Oswald, Nick Oswald and Ralph Maddox were the officers, agents and employees of the said Southern California Kennel Club, Inc., and they then and there had the management, possession, supervision and control of the said Club and of all of its properties and moneys; that the said Vincent Mangerina, Deputy United States Marshal as aforesaid, then and there served upon the said George Oswald, Nick Oswald and Ralph Maddox the said order of the United States District Court appointing the said Marion Newman receiver of said Southern California Kennel Club, Inc., and the said receiver then and there demanded of the said George Oswald, Nick Oswald and Ralph Maddox the possession of the money and property of the said Southern California Kennel Club, Inc.; that the said George Oswald, then and there stated to the said receiver and the said Deputy United States Marshal in the presence of the said Nick Oswald and Ralph Maddox, that he would not recognize the said order of the court and that no one was going to touch or lay their hands on any of the money or any of the property on the premises and the said Ralph Maddox and George Oswald both then and there stated to the said Vincent Mangerina and the said receiver Marion Newman that they, the said Vincent Mangerina and the said Marion Newman, could not take the place over and that the attorney of George Oswald and Ralph Maddox should have been notified first; that the said Marion Newman then and there told the said George Oswald, Nick Oswald and Ralph Maddox that the said Vincent Mangerina, Deputy Marshal, as aforesaid, and the said Marion Newman, receiver, were there pursuant to an order of the Federal Court, and the said Ralph Maddox and George Oswald replied that they did not care anything about the Federal Court, that they had been up against that before, and that nobody was going to touch the place or put their hands on any of the money or any part of the place, and the said George Oswald then and there said to the said Marion Newman and Vincent Mangerina 'You can't do any good in here. You better go on the outside' and with force and violence expelled the said Vincent Mangerina and Marion Newman from the said cash room, and the said defendants George Oswald, Nick Oswald and Ralph Maddox, having full knowledge of the order of said court, have refused to recognize the said order and have refused to permit the said receiver to take possession of the property of the said Southern California Kennel Club, Inc., or any portion thereof;

"That the acts of said defendants George Oswald, Nick Oswald and Ralph Maddox were done and performed deliberately, knowingly and wilfully, with the intent and purpose of violating the order of the Court and of preventing the execution of the order of the Court, and they did resist the execution of said order and did prevent the duly appointed receiver of said Southern California Kennel Club, Inc., from taking possession of the property of the said Club as ordered by the Court, and the said defendants were guilty of obstructing justice by resisting the

lawful demands of the Deputy United States Marshal aforesaid, contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States of America."

The order adjudicating the appellants guilty of contempt, after reciting the charges in the information, to the effect that the defendants had refused to turn over the property of the Southern California Kennel Club, Inc., adjudged the defendants guilty, as follows:

"That said George Oswald is guilty of contempt of court in that he refused to recognize said receiver and said order, and deliberately, knowingly and wilfully with intent and purpose of violating said order and of preventing the execution thereof, with force and violence expelled said attorney from said property; and the court is of the further opinion and further orders and adjudges that said Nick Oswald and said Ralph Maddox are guilty of contempt of court in that they, each of them, refused to recognize said receiver and said order, deliberately, knowingly and wilfully with intent and purpose of violating said order and of preventing execution thereof."

Throughout the progress of the case the appellants insisted that the Southern California Kennel Club, Inc., owned no property that was in their possession, and demanded by appropriate motions and objections that the government indicate what property it was claimed they had refused to turn over to the receiver, and what property was owned by the corporation.

The government made no proof whatever that the corporation owned the dog race track or the money in the defendants' possession and the defendants moved for a dismissal at the close of the government's case. The defendants claimed that the money and property in their possession belonged to appellant Nick Oswald. They so stated to the receiver on September 9th when he demanded possession of the property of the Southern California Kennel Club, Inc., and showed the order directing him to take possession of its property, and upon their motion to dismiss being overruled by the court they took the stand and testified that the corporation had no interest in the money demanded, or in the real estate occupied by the race track other than an equity subject to the right of Nick Oswald to possess and operate the track. Geo. D. Blair, the attorney of Nick Oswald, who had advised his client that there was no property of the corporation and had told the receiver that the corporation did not own the property or the money demanded, also testified on behalf of the defendants as to the property rights of the corporation, as follows:

"I am familiar with the history of the Southern California Kennel Club, Inc. I am vice president of the Southern California Kennel Club, Inc. Southern California Kennel Club, Inc., was organized to take over what assets the copartnership Southern California Kennel Club, a co-partnership, had, which was a limited co-partnership under the laws of the State of California.

"The Court: Who were the partners?

"The Witness: The general partners were McDevit, Ostendorf and McGuire. There were several limited partners. As to those I can't recall exactly their names. But there were several of them. That co-partnership originally leased the land at Compton and erected the buildings and structures on the land. They became financially involved and owed something around $20,000, including approximately $2,300 in labor bills, which they were being pressed for and would be pressed for shortly by the Labor Commissioner for payment. Being a bankrupt co-partnership it looked as though they were going to be getting into difficulties. As a result, George Oswald and Maddox advanced some $2,300 to pay those labor bills. An offer was made to this corporation, the Southern California Kennel Club, Inc., whereby the assets of the co-partnership would be turned over to the corporation; the corporation then to do what it could to carry along the track as best it could or until the point that they could open up and probably make a profit, and out of the profit to pay off the indebtedness, that is, the money advanced by George Oswald and Maddox, and the indebtedness incurred such as mechanics' liens, by the original co-partnership, and the running expenses, etc., and then pay back to the original investors of the co-partnership the amount of money that they had put in, that to come out of the profits. The District Attorney's office had taken the view that the track should not run. As a result, it was questionable whether or not the track would ever be able to open. There was legislation pending in the legislature at Sacramento. The Horse Race Bill was passed or about to pass,—so there was nothing definite about whether you could open or not. Shortly after the Horse Race Bill was passed we received information from the District Attorney's Office that there would be no objection to opening the track and run-

ning the dogs, under the option system. I believe that was about July 5th or 6th.

"As a result, it became necessary to advance or furnish enough money to open the track, which would run into not less than $5,000, as it required some five, six, seven or eight thousand dollars for change, to pay purses, etc., to operate.

"As a result, the corporation entered into an agreement with Nick Oswald a day or so before the track opened, whereby the corporation turned possession of the track over to Nick Oswald for the racing meet with the understanding that Nick Oswald would employ Ralph Maddox and George Oswald to assist him out there and look after the track, the idea being, joining them in so they could look after whatever interest the corporation might have, or the welfare or profit that might be worked out. Nick Oswald furnished the money and went into possession, and after he had been there for a few days, a Marshal's sale was held under a foreclosure of a mechanic's lien upon the Marshal's Certificate of Sale and Foreclosure as set forth in defendants' Exhibit 'A', to E. B. Tuttle. E. B. Tuttle had demanded possession of the track and was going to take it,—at least it appeared to me he could get it. That was along about July, so in order to protect the possession of Nick Oswald and whatever investment he had made there and to protect all the parties concerned, I told Nick Oswald I thought it would be advisable if he would purchase Tuttle's interest, so Nick Oswald purchased from Tuttle the interest he had by reason of the Marshal's Certificate of Sale and he paid Tuttle approximately $1,700, which I think was $200 more than the original judgment, Tuttle demanding the additional sum on account of attorney's fees and expenses. Nick Oswald stated at the time that if the Southern California Kennel Club, Inc., at any time wanted to purchase back the property, that by reimbursing him and paying him back, they could then purchase back the property at any time. So after the purchase was made Oswald continued on and the track ran until September 9th, when I went down to the track I met Mr. George Oswald. * * * The order will be complied with, but the Southern California Kennel Club has no assets here to turn over; that under the circumstances there is no possession to be turned over to you. * * *

"The Southern California Kennel Club, Inc., has never had any cash. It has never had a bank account and did not have any as-

sets at 1200 Long Beach Boulevard on the night of September 9th, 1933."

■ There is no evidence to support the conclusion that the corporation owned anything at the place where the alleged contempt occurred. The government did not sustain the burden of proof and the defendants affirmatively established the fact that there was nothing in their possession which the order required to be delivered to the receiver. Even if the trial court discredited the testimony of the defendants tending to affirmatively establish their ownership of the property, there was no evidence to establish ownership of the property by the corporation, hence there was no contempt in refusing to deliver the property demanded because the order of the court accompanying the demand showed that the demand was unauthorized. If we assume, as we must, that the property demanded by the receiver was not covered by the order, that the receiver had no right to go upon the property or to remain there against the wishes of the lawful owner, and that the refusal to turn over the property and the expulsion of the receiver's attorney was proper if no unnecessary force was used, nothing remains in the case but the statement of George Oswald, testified to by the witness Frank C. Bellman, as follows:

"A. Mr. George Oswald read the paper [order appointing receiver] over first, and he says, 'What does all this mean?' Mr. Mangerina [the Deputy Marshal] says, 'I will read it to you.' So he took and read certain paragraphs of it, and explained what it meant. Mr. Oswald says, 'We don't care anything about that.' He said, 'We have been up against the federal court before, and we don't care anything about it.' He said, 'Nobody is going to touch this money.' Mr. Mangerina says, 'This is an order of the federal court and I would advise you to recognize it.' Mr. Oswald said, 'Nobody is going to touch this money.' About that time Mr. Nick Oswald came in and he took the paper and read it himself, and the conversation went on, and the advice was given Mr. Oswald they better turn the money over."

And by Donald E. Rupee, as follows:

"Mr. Oswald at that time said that he did not care if the court made an order or not. He further stated that he had met this condition before, and he said they always got around it by putting in a third party claim and taking care of these matters of attachment."

■ These statements were injudicious and, if made in the presence of the court, would

have constituted contempt of court, but when made to a person who was attempting to make an unauthorized use of a court order to seize property belonging to the defendants it cannot be punished as contempt of court. The order of the court appointing the receiver directed him to take charge of all property belonging to the corporation. This order was the measure of his power. He had no authority to demand possession of property that did not in fact belong to the corporation. Neither did the order require the appellants to turn over property that belonged to them. If the property demanded had been identified in the order other than by its ownership, the situation would have been different.

Order and sentence reversed.